# Washington Female Seminary, Appellant, *v.* Washington Borough.

*Boroughs—Agreement as to street line—Committee of council—Ratification.*

A committee of councils has no authority to bind a borough by an agreement as to street lines; and any agreement which they may make for that purpose can only become effective by the ratification, evidenced by some unequivocal act of an authority competent in that behalf to represent the borough. If, however, the borough accepts property under the agreement it will not be permitted to repudiate the agreement unless it surrenders the property.

Where a landowner has been induced by an agreement with a committee of councils of a borough to surrender certain of his land, and at the same time, and under the same agreement, has set his curb line in a certain location, the burden is upon the borough when it repudiates the agreement to establish by evidence that the curb line is within the line of a public highway. This burden must be discharged without any aid from the conditions which have supervened since the agreement was made.

*Boroughs—Land—Streets—Location of streets.*

In a proceeding to ascertain the lines of a street in a borough, where it appears that the streets within the borough limits have been located upon the ground long prior to the recollection of any living witness, and that the ancient deeds called for such streets as boundaries, the location of such streets cannot be changed to accord with a plan made over a hundred years before at the establishment of the borough, and assumed, for the purpose of the proceeding, to be the original plan of the borough, where it appears that none of the streets, as located on the ground, conformed to the streets appearing on the plan.

Lines as actually run and established upon the ground will control the mere distances indicated by deed or plan in the absence of evidence establishing a contrary intention. The principle that the lines marked upon the ground must control, applies with the same force to a plan of lots that it does to a deed.

*Deed—Dedication of land—Acceptance—Streets.*

The dedication of a street to public use by a private owner of land, will not make it a public highway unless it is actually opened upon the ground and accepted by the public.

Where land in a borough has been dedicated to the use of a street, but the street has not been opened for more than twenty-one years, and has not been used by the public for the purpose of a street for that period, the power of the borough to open the street is at an end, by force of the provisions of the Act of May 9, 1889, P. L. 173.

*Evidence—Ancient plan—Unofficial paper.*

*It seems* that an ancient plan found amongst a miscellaneous mass of papers in the surveyor general's office at Harrisburg, and not signed by the owner of the land or by any other person for him, is not admissible as evidence in a proceeding to determine the location of streets, since it appears that the plan was not an official paper made by any regular officer, that it was not filed in the proper place, and that it was not a survey adopted by the land office. Commonwealth v. Alburger, 1 Wharton, 468, distinguished.

Argued April 17, 1901.    Appeal, No. 10, April T., 1901, by plaintiff, from decree of C. P. Washington Co., No. 1045, in equity, dismissing bill in equity in case of the Trustees of Washington Female Seminary v. Burgesses and Inhabitants of the Borough of Washington. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Reversed.

Bill in equity for an injunction to restrain the enforcement of a borough ordinance. Before TAYLOR, J.

The court dismissed the bill.

*Error assigned* was decree dismissing bill.

*A. M. Todd* and *John H. Murdoch*, for appellant.

*J. P. Miller*, for appellee.

OPINION BY W. D. PORTER, J., January 21, 1902:

The council of the defendant borough, on May 15, 1899, enacted an ordinance "establishing the curb lines on South Lincoln street, between Strawberry alley and Maiden street." The plaintiff is the owner of the entire frontage on the west side of Lincoln street between the street and alley named. The curb line established by the ordinance in question was a straight line drawn between the points of intersection of Strawberry alley and Maiden street, respectively, with the curb on the west side of Lincoln street as the same had prior to that

time been constructed and maintained by the plaintiff. The line upon which the plaintiff was then maintaining the curb on the west side of the street, and in accordance with which they had constructed their sidewalk, curved out to the eastward between the points named and bears the same relation to the line sought to be established by the ordinance which a bow does to its string. The plaintiff had moved back its fence at the time of the construction of the old curb to correspond with the line thereof, and had laid a sidewalk between the line of the fence and the curb. The curb line sought to be established by the ordinance would cut away a part of the steps of the new seminary building and necessitate the reconstruction thereof, and would throw the greater part of the present sidewalk into the cartway of the street, at one point taking the entire width thereof and actually encroaching upon the property of which the plaintiff has remained in exclusive possession. The plaintiff was given written notice to comply with the terms of this ordinance in twenty days thereafter, or in default the borough authorities would cause said work to be done and collect the cost thereof with twenty per centum advance. This bill was then filed to restrain the defendants from carrying the ordinance into execution. The learned judge of the court below dismissed the bill, and from that decree the plaintiff appeals.

There are a number of assignments of error, but the record presents for consideration only three questions. First. Was the borough estopped from establishing a curb line different from that which the plaintiffs after an alleged compromise agreement with the borough authorities had been induced to accept, and upon which, in compliance with that agreement, they had constructed the curb and sidewalk? Second. Is the curb line which the defendant now seeks to establish within the lines of the public highway, or does it encroach upon the private property of the plaintiff? Third. Is the ordinance unreasonable, burdensome and void, even if the proposed curb line is within the line of the highway, because it takes away the entire sidewalk from the plaintiffs and places upon the opposite side of the street a foot walk of unusual width?

The facts upon which the plaintiff asserts that the defendant should be held to be estopped are not disputed. They were conclusively established by evidence, their existence was rec-

ognized in the opinion filed by the learned judge of the court below and they were admitted at the argument in this court. In the year 1890, the borough of Washington caused an official survey and map of all its streets and alleys to be made, and it was found that Lincoln street at the point of its intersection with Maiden street was not, as actually open upon the ground, of the width of forty feet, which was the width ascribed to it in certain ancient deeds. There stood upon the northeast corner of these streets an old building, which according to the testimony of every witness called and every document presented in the present case, unquestionably encroached upon Lincoln street, but the borough authorities made no attempt to cause that building to be removed, nor did they undertake any legal proceeding to widen the street. Sometime prior to this, prob· ably about 1884 or 1885, the plaintiffs had been induced by some arrangement with the borough authorities to surrender a small triangle of ground at the extreme corner of Maiden and Lincoln streets, to relieve the situation, but they had for many years maintained a fence along the west side of Lincoln street upon a line which is certainly to the eastward of a considerable portion of the curb line which the borough now seeks to establish, and no evidence was produced in this case which even remotely tended to establish that Lincoln street, or any part of it, ever had been opened upon the ground west of that old fence. This was the condition of affairs in 1890 when the borough authorities undertook to induce the trustees of the seminary to make some concession in the interest of the public. The borough council referred the matter to a committee, with direction to meet the borough engineer and the trustees of the seminary. That committee met the borough engineer and the representatives of the trustees of the seminary upon the ground and the committee entered into an agreement with the trustees that the western curb line of Lincoln street should be established and maintained upon the curved line, in accordance with which the curb and sidewalk were afterwards constructed, and the trustees agreed to surrender the ground necessary for the carrying of this agreement into execution. In accordance with this agreement the plaintiff moved back its fence six or seven feet to the westward, at the corner of Maiden street, and placed it upon a curved line so as to give the width necessary

for a sidewalk between it and the curb line which had been thus agreed upon. The plaintiff was afterwards notified by certain officers of the borough to grade, pave and curb the side-walk on South Lincoln street, and did so upon the lines which had been agreed upon. The action of the committee never was confirmed by an ordinance of the borough council. The learned judge of the court below was of opinion that these facts were not sufficient to estop the borough council from ascertaining the true location of the public highway and establishing the curb line in accordance with that location, and with that conclusion we concur. We are by no means prepared to say that had the borough council by ordinance approved the agreement, into which the committee had entered, it would not have become binding upon the borough, but it is not necessary to consider that question for no such ordinance was adopted. The committee of councils was without authority to bind the borough, and any agreement which they made could only become effective for that purpose by the ratification, evidenced by some unequivocal act, of an authority competent in that behalf to represent the borough. The ordinance of May 15, 1899, and the answer filed by the defendant in the present case constitute a direct and unequivocal repudiation by the proper borough authorities of the unauthorized act of the agents of the borough, the committee of council in 1890. That agreement goes for nothing, by it the borough neither gained nor lost any right. The borough having repudiated the bargain made by its agent, must surrender the property which its agent unlawfully procured ; if it attempts to assert any right under the contract, then it must make the contract good. The plaintiff has the right to restore the old fence line and take possession of the property which it surrendered upon the faith of the agreement with the committee of council, unless some valid reason, not founded in said agreement, for the denial of that right be established. The rights of the parties are to be determined in this proceeding as if the agreement of 1890 had never been made and as if the plaintiff had down to the present time remained in possession of the land up to the line of the old fence which was at that time removed.

Assuming the plaintiff to be in possession of the land which it was induced temporarily to surrender by the unauthorized contract of the committee of the borough council, this ordinance

would compel it to set the curb of the street inside the line of the property of which it is in possession. In such a case the burden is upon the borough to establish by evidence that the curb line is within the line of a public highway. This burden must be discharged without any aid from the conditions which have supervened since the trustees of the plaintiff, in 1890, were induced to make the changes above recited. If the borough has failed to establish that the land was in 1890 within the lines of a public highway, then the uses to which the land is to be devoted are to be determined by the plaintiff, and it may either restore its fence to its old line, or it may continue to use it as a sidewalk for convenient access to its own property.

The original plan of the town of Washington was laid out in 1781, by David Hoge, who seems at that time to have been the owner of all the land in that vicinity. The land over which the street now called Lincoln was subsequently located was not included in the original plot of the town, which indicated the lands along the eastern boundary thereof to be private property. It was not until some thirty years later, so far as is indicated by the evidence in this case, that any steps were taken which indicated an intention to establish a street along the eastern line of the original town plot. The original plot was rectangular in shape and lot No. 36 was at the extreme southeastern corner of the same. William Hoge by deed dated May 14, 1809, conveyed lots Nos. 31, 32, 33, 34, 35 and 36 to Silas Pruden, describing the lots as bounded on the west by lot No. 30, on the north by Strawberry alley, on the south by Maiden street and on the east by land of John Hoge. The land over which Lincoln street was subsequently laid out was still private property. William Hoge seems afterwards to have acquired title to the land to the eastward, which had been held by John, and on May 24, 1814, conveyed to Peter Martin a piece of land, designating it as four lots in the additional plan of the town of Washington. These lots are described as being bounded on the south by the continuation of Chestnut street, on the north by the continuation of Spruce alley, on the east by an alley, "and by a forty-feet street on the west." This "forty-feet street" is conceded to be the same which afterwards came to be known as College street, which name was subsequently changed to Lincoln street, and this deed contains the earliest

evidence of an intention to dedicate the street as a public highway.  The deed contains no reference to any monument by which the location of the street could be fixed, but it seems to be assumed by the parties that it was located to the eastward of and immediately adjoining the eastern line of the borough throughout the entire length of the same.  We must take it for granted, therefore, that William Hoge dedicated to public use a street forty feet wide outside of the original town plot but along the eastern line of the same.  He had no power to dedicate any part of lot No. 36, which he had sold and conveyed five years earlier.  The undisputed evidence in this case shows that taking the location of the streets and alleys to the eastward of Lincoln street as they exist to-day, every grantee of William Hoge can have all the land that his deed called for, and yet leave more than sufficient space to make Lincoln street forty feet wide throughout its entire length without interfering with the eastern line of the original town plot as it has always been recognized to have been located upon the ground.  The plaintiffs have succeeded to the title of Silas Pruden, and the first recognition of a street to the eastward which we find in their chain of title is in the deed from Pruden to Baird and Marshall, dated March 29, 1817, in which the call is for "New Street" to the eastward of lot No. 36.  Pruden did not own the land east of lot No. 36 and could not dedicate it, the call for the street is a matter of description and recognized the dedication of the land to the eastward which had been made by Hoge.  The borough of Washington was incorporated in 1810, and from that date until December 22, 1854, the easterly line of lot No. 36 and the western line of Lincoln street was the division line between the borough and the adjoining township, the lot was inside and the street was outside of the borough, the eastern line of the borough being identical with the eastern line of the original town plot, as the latter was and had been recognized to have been located upon the ground.  On December 22, 1854, the limits of the borough were extended to the eastward and since that date Lincoln street has been within the control of the borough authorities.  There is not to be found in any deed or plan which was offered in evidence in this case a reference to or call for any monument by which the original actual location of Lincoln street upon the ground can be defi-

nitely determined as different from the location upon which it is not disputed that it was recognized to be as early as 1852, upon which location monuments were then placed by Cooper Morrison, a surveyor employed by the borough. Those monuments were followed by John G. Rupple in making the survey for the first borough map, in 1855, and the result of that work was the Doran map. That map showed that the westerly line of College, now Lincoln, street was a straight line running through from Walnut street to Maiden street, a distance of probably 2,200 feet. From Walnut street to Strawberry alley, a distance of almost 2,000 feet, the location of that street has from that day to this remained unchanged, no person seems to have pretended that it was erroneous, and upon that line the borough has actually paved and improved the street down to Strawberry alley. The only changes which have been made in the location of the street since 1852 have been along the line of the plaintiffs' property between Strawberry alley and Maiden street, where the line has been shifted to the westward onto the property of the plaintiffs. John G. Rupple, who made the survey for the Doran map, testifies that in 1855 he found Lincoln street opened up on a straight line, and forty feet wide through from Walnut street to Strawberry alley, and that at that time there was no angle on the westerly side of the street between Walnut street and Maiden street. That on the easterly side of the street at the intersection of Lincoln and Maiden streets there was a building which stood in the street; that that survey made no angle in the street opposite the seminary property, and the street was carried straight through. "The members of council and citizens desired that street to be made straight, but there was a great deal of controversy about it, and that line was run cutting off the front part of what then was the Muzzer house, now the Morgan property, and the idea was to appropriate enough of that property to make a forty foot straight street." The same witness testified that the only change that had been made in the street between that time and the present was opposite the property of the plaintiff, that he himself as borough engineer had twice moved the corner at Maiden street westward onto the property of the seminary, such removals being made with the consent of the seminary authorities. This corroborates the testimony of Mr. LeMoyne and

the other witnesses who testified as to the negotiations between the trustees and the committee of councils; three feet having been yielded the first time and seven the second in pursuance of the agreement of the committee of councils which the borough now repudiates.   There was not a scintilla of evidence that Lincoln street ever had been open over the ground in dispute, or that the westerly line of that street along plaintiff's property had been other than the well recognized property line as it exists to-day from Walnut street to Strawberry alley produced straight through to Maiden street.   The defendants did seem inclined to raise an issue of fact as to the actual location of the street upon the ground and called as a witness Henry DeNormandie, who testified, in 1900, that he remembered the property for over fifty years; that in 1847 or 1848 his father had assisted in building a fence on the Lincoln street side of the seminary property; and that Cooper Morrison had surveyed it and given the line for the fence.   In his examination in chief he testified that the corner post of the fence, at Maiden street, was at least two feet and a half east of the gas post on Maiden street.   In view of the admitted fact that the corner has been shifted ten or eleven feet to the westward, it is manifest that if the gas post which stood there fifty years ago was only two feet and a half from the corner, it would, if it had remained in the same position until this day, have stood in the cartway of the street, the gas post on that corner must have been shifted to the westward.   This witness testified on cross-examination with regard to that fence, that, "It stood there for a good while. In 1873 or 1874 I painted that fence, then afterwards it was torn down.   Q. Was there another one built?   A. No, sir; there's never been any built since that.   Q. And that was how long ago that it was torn down?   A. Well, I can't say, Mr. Murdoch, but I don't think that fence has been torn down more than twelve years; it might be, but I don't think it's over that."   The witness testified further that, "if that fence had been continued on up Lincoln street, it would be on the same line as the fence of the upper lots, what is now the Caldwell property and the college property, and so on;" that the fence stood on a line that would be practically a straight line from Maiden street up along the west side of Lincoln street.   The testimony of this witness established that his father, at least as

early as 1848, had, under the direction of Cooper Morrison, the engineer who afterwards, in 1852, located the borough monuments, built the fence for the seminary along the west side of Lincoln street on the continuation of what is now recognized to be the western property line of the street from Walnut street to Strawberry alley carried through to Maiden street, and clearly identified that fence as upon the very location where it stood down until the time when the trustees were induced to remove it through the mistaken belief that they were dealing with a committee of councils which had authority to bind the borough. Their experience with this witness seemed to discourage the defendants and they made no further attempt to show that Lincoln street ever had been opened upon a location to the westward of that which it occupied in 1890.

Having failed to show that there had been an actual highway over the ground in dispute, the defendants sought to establish a theoretical highway which should suit their purpose.  They attempted to show that Lincoln street as it had existed upon the ground for at least fifty years was not upon its true location.  The great liberality in measuring off land to their grantees which had been displayed by David Hoge in the plot of the original town, and by William Hoge in dealing with his additions thereto, was attempted to be used for the purpose of depriving the plaintiff of its property.  It was known that while every street had the full width called for by the original plan there was in almost every square of the old town plot a considerable surplus of land.  The public had all the streets to which it was entitled and, through the proper authorities, had improved and cared for those streets upon the very location that had been recognized as the true one, by the grantees of the founders of the town, during a period of over a century.  No private owner claiming under David or William Hoge has less land than his deed calls for, unless it be this plaintiff; most of them have a very desirable surplus.  The council of the borough conceived the idea of fixing the location of Lincoln street by arbitrarily assuming that some other street in the borough had been originally located upon the ground with scientific accuracy, and taking such street as a base line, measuring the distances to Lincoln street, as indicated by the old plans, with the strictest accuracy attainable with modern skill using im-

proved instruments. They proposed to revise the work done by the surveyors of David and William Hoge, who probably had measured these distances with chains in which the links were well worn, and sent a modern engineer to remeasure the distances with the most accurate instruments obtainable. If this is a legitimate means of ascertaining the legal location of the public highways of this ancient town all the consequences cannot easily be imagined, but it is apparent that they would be interesting if not pleasant for the inhabitants. When the borough council repudiated the agreement into which their committee had entered with the seminary and determined to relocate Lincoln street in the manner indicated, the first question which confronted them was the ascertainment of the base line. None of the plans or ancient deeds referred to any monument natural or artificial. The councils seem to have concluded to select for the purpose some street other than Lincoln. Now Lincoln street had been dedicated by William Hoge. It was a part of his additional plan of the borough; it would seem natural that they should have turned to this plan of the eastern extension of the borough when they came to select the monument natural or artificial from which they would measure their distances in ascertaining the location of Lincoln street. The council did not do this for the very evident reason that if they had selected as a base line any street in the plan of which Lincoln street was a part, and then applied their peculiar theories for ascertaining the location of the street last named, they would have shifted the location of Lincoln street to the eastward, for William Hoge was also liberal in measuring land for his grantees. This result would have defeated the very purpose of the council, which seems to have been to take the land of the plaintiffs without compensation. They determined therefore to assume as a base line some line or street in the original plot, to the westward; by measuring from such a line the apparent theoretical location of the eastern line of the old plan would be shifted to the westward to the extent of the excess of the measurements of a century ago over the strict measurement which the council proposed to enforce.

The original town plot never was recorded. The streets within its limits had been located upon the ground long prior to the recollection of any living witness. The ancient deeds

call for those streets and the other lots in the plan as boundaries. The defendants offered in evidence a certified copy of what they assert was the original plan of the town. This paper is interesting, although its admissibility in evidence may be doubted. A part of the history of the original is shown by the records of the office of the surveyor general at Harrisburg. In May, 1801, a mass of papers in a confused situation was found in a large box in the office of the surveyor general, but how those papers got there is unknown, they did not appear to have been registered, they were indexed at that time by order of the surveyor general. Among those papers was the original, the certified copy of which was offered in evidence. On the paper the date October 14, 1781, is written, but the plan is not signed by any person, nor is there any indication by whom it was made. The name of the proposed town seems to have been changed, but by whom does not appear; as originally written it was " Bassett alias Dandrige Town," but ink lines are drawn over the words " Bassett alias Dandrige " and above them is written the word " Washington," and then follow the words " Washington County, State of Pennsylvania." Directly under this appear the words " David Hoge, Esq., Proprietor." This was not an official paper nor was it on file in the proper place, it was not a survey adopted by the land office, and it does not appear to have been made by any regular officer. David Hoge was not and never had been connected with the government of the colony or the commonwealth, and the reasons which were held sufficient to warrant the admission in evidence of certified copies of ancient plans on file in the office of the surveyor general in Commonwealth v. Alberger, 1 Wharton, 468, could have no application to a paper such as was here presented. David Hoge was a private individual, and to hold him or his grantees bound by a plan which is not signed by him, nor by any other person for him, does not seem reasonable, without some evidence that he had authorized some one to make the plan. We will accept the plan, however, at its full face value, and assume that this is the very plan which David Hoge authorized his surveyors to carry into execution by marking the lines upon the ground. This plan does not indicate a single monument either natural or artificial, there is nothing which would render it possible to say this point upon the map corresponds with any given point

upon the ground.   On the margin of the map is the usual symbol for indicating the points of the compass, and if it is correctly placed no street or line upon the map runs anywhere near due north and south or east and west, and there does not appear upon the map any indication of the course or bearing of any street or line upon the plan, nor anything by which the angle to the meridian could be ascertained.   There is nothing by which any one point upon the plan can be fixed upon the ground, and even if such a point could be fixed there is nothing by which the direction of the lines running from that point could be ascertained.   Monongahela street, which is now called Main, runs through the center of the plan in a direction considerably to the west of north, Ohio street, which is now called Beau, seems to intersect and be perpendicular to this street at the center of the plan, running somewhat to the north of east. " Chirtries street," which was afterwards known as Second and is now called College street, appears upon the plan as east of and parallel to Monongahela street.   Gay street, now called Wheeling street, is south of and parallel to Ohio street, and Race now called Chestnut street is north of and parallel to Ohio street.   The streets and alleys of the town seem upon the face of this plan to be parallel or perpendicular to each other.   There is nothing upon the plan to indicate the point of beginning in ascertaining the tract of land to which it was to be applied, unless it be that lot No. 1 on the plan is at the southwest corner thereof being in the southern tier of lots of which lot No. 36 was the most eastern.   It is evident, therefore, that the manner in which this plan was actually applied to the land must be determined from extrinsic evidence, and as none of the deeds call for any monument which indicates the manner in which the plan was actually applied, the whole matter rests in parol testimony.   There is no evidence that the location of any street dedicated by the plan has ever been shifted from the ground upon which it was originally opened.   The streets are used to-day upon the ground on which they were established at the time of the earliest recollection of all the witnesses who testified, and every street has its full width as indicated by the plan.   It is, however, an undisputed fact that no two streets in the town are either perpendicular to or parallel with each other, and almost every block in the town contains more land than

according to the theory of the plan it ought to have.   This being the case, it is apparent that if we arbitrarily assume any given corner of the plan to be correctly located and measure from it in order to determine the location of the lots and streets it will be found that no lot or street in the plan is upon its true location.   In that square of Main street between Beau street and Chestnut there is a surplus of thirteen feet of ground.   If the theory of the borough council is applied there, then there is a public highway running through the town from east to west, thirteen feet south of Chestnut street or the same distance north of Beau street, to be determined by the point from which you begin to measure.   Walnut street is a public highway running along the entire length of the northern line of the original property, and Maiden street runs along the entire length of the southern line of the original plot.   If the theory of the borough council is to be carried to its legitimate conclusion and it is assumed that the southern line of the borough is upon its true location, then every owner who is in possession of property on the south side of Wheeling, Beau, Chestnut or Walnut streets is guilty of maintaining a public nuisance, for he is encroaching upon what is legally a public highway; or if the assumption be that the northern line of the borough is correctly located, then it is the owners of property upon the northern sides of the streets who are involved in trouble.   Should it be assumed that Beau street is upon its proper location then the parallel highways north of it are really south of the ground over which the public has been traveling for a century, while the parallel highways south of it are north of what the people of the town have always accepted as their true location.

The borough council in selecting a base line passed by College street, manifestly for the reason that in one square they could not hope to find sufficient surplus to meet the demands of the situation, and ordered the borough engineer to locate Lincoln street by measuring eastward from the center of Main street the exact distance indicated by the old plan between that line and the eastern limit of the plot.   The assumption of the accuracy of the location of Main street was without warrant in the evidence.   The learned judge of the court below seems to have sustained it upon the ground that Main street was the principal street of the borough and was therefore more

likely to have been located with care.   The difficulty is that it is
an undisputed fact that Main street was not located according
to the theory of the old plan.   That plan called for a straight
street, whereas it is an undisputed fact that the Main street
now in existence upon that ground and from which this engi-
neer was required to measure is a street broken up into three
pieces, having two angles in it, one of which is near the court-
house.   There was no manner in which it could be determined
which if any one of these fragments of the street was upon the
true location and had the exact bearing contemplated by the
old plan.   If the theory of the plan is to be so strictly enforced,
then this Main street, as it is found upon the ground to-day,
has no warrant for its existence in the original plan.   It must
be borne in mind that it is not sufficient for these defendants
to raise a doubt as to the true location of Lincoln street, they
must produce evidence which would justify a finding that there
was an actual location.   The original plan affords no evidence
that David Hoge intended that the distances in his town should
be ascertained by measuring from Main street.   The difficulty
with the position of the borough council which seems to have
been acquiesced in by the learned judge of the court below is
that it entirely ignored the legal principle that the lines as ac-
tually run and established upon the ground will control the
mere distances indicated by deed or plan in the absence of evi-
dence establishing a contrary intention.   The principle that
the lines marked upon the ground must control applies with
the same force to a plan of lots that it does to a deed.   The
evidence as to the location of all the streets of this ancient town
plot stands upon the same footing, the uninterrupted recogni-
tion and use of the same as public highways for over a century.
The location of Main street is established by the same evidence
which makes College street as it exists to-day upon the ground
a public highway.   In the square between Main street and Col-
lege street it is found that there is considerably more ground
than was called for by the ancient plan, but both streets were
dedicated at the same time and both have been open as public
highways during the same long period.   There is no more legal
ground for shifting the location of College street than for
changing that of Main street, each of them must remain upon
the ground where they were opened and where they have been

used for over 100 years. The old plan, it is true, indicates that the exact distance from the center of Main street, as theoretically located, to the eastern boundary of the town plot was 1,173 feet. The uncontradicted evidence in this case establishes beyond any reasonable doubt that from the center of Main street, as it has been actually located upon the ground, from the line which has always been recognized as the eastern line of the borough is from ten to twelve feet more than the theoretical call of the plan. After 120 years' recognition of and acquiescence in the actual location and opening of the streets upon the ground, by David Hoge and his successors, it is too late to inquire whether the streets were opened upon the exact land, which they would have occupied if the theory of the plan had been carried into execution with scientific accuracy. There is no more reason why the old and well recognized eastern limit of this town plot should be shifted to the westward, than that the crooked Main street, which violates the primary theory of the plan, should be straightened and shifted to the eastward in order that the distance between the two may be exactly 1,173 feet. This borough council was without authority to do either: Van Buskirk v. Dawley, 91 Pa. 423. There was no evidence which warranted a finding that Lincoln street as dedicated by William Hoge was parallel to Main street as now located upon the ground and exactly 1,173 feet distant therefrom. It is an undisputed fact that if Lincoln street is to be relocated in the manner for which the borough authorities contend, it would involve a shifting of the street westward from what has always been recognized as its true location upon the ground, and will take a strip of what has always been considered private property, not only upon plaintiffs' land but upon that of Caldwell, Washington & Jefferson College and of other owners upon the western side of the street clear up to Walnut street. The strip of ground thus taken would, because Main street is not straight, vary in width, being ten feet at the corner of Maiden street and about twelve feet further north upon the lands of Washington & Jefferson College. This would leave the new building of the Washington Female Seminary an actual encroachment upon the street to the amount of about eight inches. We are convinced that there was no evidence to warrant a finding that the easterly line of the original town plot was ever either

theoretically or actually located farther west than that location
which has always been recognized to be the boundary upon
that side, and which has certainly been recognized as the west-
erly line of Lincoln street for over half a century.    According
to the uncontradicted testimony of all the witnesses who were
examined upon that point, this would make the property line
of the plaintiff upon Lincoln avenue where it intersects Maiden
street ten feet east of the line to which the plaintiff would
have been required to retire if the agreement between a num-
ber of its trustees and a committee of the council had been en-
tered into in such a manner as to make it binding.    The property
line is actually in the cartway of Lincoln street and east of the
curb which the plaintiff has been maintaining on the west side
of Lincoln street, at the corner of Maiden street.    This gives
the plaintiff exactly the amount of frontage on Maiden street
which its deeds call for, for it seems to be one of the few prop-
erty owners in the borough not in possession of more land than
strictly required by the chain of title from David Hoge.

Even if it be conceded that the westerly line of the street
which William Hoge intended to dedicate was parallel to and
precisely 1,173 feet distant from the center line of Main street,
the mere dedication of that land did not make it a public high-
way.    The learned judge of the court below seems to have
held that dedication alone was sufficient to constitute the land
dedicated a public highway, and in support of that position cited
Kopf v. Utter, 101 Pa. 27, and Commonwealth v. Moorehead,
118 Pa. 344.    A hasty examination of Kopf v. Utter might
lead to the conclusion arrived at by the learned judge, but
further examination must lead to a different result.    The street
over which the controversy in that case arose had been dedi-
cated by the commonwealth over land of which it was the sole
proprietor.    When the sovereign power thus dedicates its own
land as a public highway the very dedication implies an ac-
ceptance, and the land thus dedicated becomes a highway with-
out an actual opening upon the ground and user by the public.
No such result follows a dedication by a mere individual; the
dedication of a street to public use by a private owner of land
will not make it a public highway unless it is actually opened
upon the ground and accepted by the public : Commonwealth
v. Shoemaker, 14 Pa. Superior Ct. 194; Commonwealth v.

Royce, 152 Pa. 88.   This distinction between the effect of dedication by the commonwealth and a grant by an individual is clearly drawn in Commonwealth v. McNaugher, 131 Pa. 55. In the case of the Commonwealth v. Moorehead, especial stress was laid upon the fact that the jury had found that "prior to the building of said house the said street was habitually traveled by the public as they wished." It must be borne in mind that we are not here dealing with the private rights of the grantees in a plan of lots, but with the assertion by the borough of a right to control the land as a public highway. There is no evidence whatever that Lincoln street ever was opened and used by the public over the land which the borough authorities now undertake to seize.   The dedication by William Hoge was made in 1814, if it was of the land which the borough authorities now seek to control, it never had been opened as a street and could not have been accepted by the public; more than twenty-one years having elapsed the power of the borough authorities over the unopened part of the street was at an end, by force of the provisions of the Act of May 9, 1889, P. L. 173; Quicksall v. Philadelphia, 177 Pa. 301; Woodward v. Pittsburg, 194 Pa. 193.   The burden was upon the defendants to show not only that William Hoge had dedicated this land, but that the street had been opened in accordance with the dedication and accepted by the public as a highway; that the very land over which they attempted to exercise dominion had been within the lines of the highway as opened and accepted.

There can be no question that the borough authorities have the power to widen or straighten this street, but the manner in which that power is to be exercised is by law clearly defined, and they must make compensation for property taken, injured or destroyed.

The decree is reversed, the bill is reinstated and the record is remitted to the court below with direction to issue a perpetual injunction as prayed for in plaintiffs' bill, and it is ordered that the defendants pay the costs in the court below and upon this appeal.